UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80454-CIV-MARRA

JACK T. KRAUSER, D.M.D., an individual,

Plaintiff,

vs.

BIOHORIZONS, INC. a Delaware corporation,
BIOLOK INTERNATIONAL, INC., a Delaware
corporation and BIOHORIZONS IMPLANT
SYSTEMS, INC., a Delaware corporation,

Defendants.
_____/

## OPINION AND ORDER

This cause is before the Court upon Defendants' Corrected Motion for Summary Judgment (DE 140). The motion is fully briefed and ripe for review. On July 6, 2012, the Court held oral argument on the motion. The Court has carefully considered the motion and is otherwise fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving party, for the purpose of this motion, are as follows:

Plaintiff Dr. Jack Krauser ("Plaintiff" "Krauser") is a periodontist. (Second Am. Compl. ¶ 17.)  BioLok International, Inc. ("BioLok") is a Delaware corporation formerly known as American Bio-Dental Corporation.  Biolok is the corporate successor to Minimatic Implant Technology, Inc ("Minimatic), a Florida corporation which merged into BioLok in or around

1997.  BioLok is presently owned by BioHorizons, Inc. ("BHI").  (Roy Steven Boggan Decl. ¶ 3, DE 128.)   BHI is the indirect parent company of BioLock.  (Id. at ¶ 5.)  BioHorizons Implant Systems, Inc. ("BioHorizons") is a Delaware corporation involved in the design and manufacture of dental implants and related products, as well as medical products unrelated to dental implants. (Id. at ¶ 4.)

Plaintiff did "design work" from about 1988 to 1993, and some consulting work beginning in 1991, for Minimatic.  (Pl. Dep. 38, Ex. F, DE 125.)  Plaintiff created a dental implant system, in or around 1987, which Minimatic made and eventually distributed. (Id. at 439, 449-50, 475; Krauser Aff. ¶ 3.)  In 1988, Plaintiff retained Minimatic for the purpose of producing drawings and manufacturing prototypes of his system, including implants, attachments and related products. (Id. at ¶ ¶ 4-8.)  Later, in 1991, Minimatic proceeded to manufacture and sell Plaintiff's system. (Id. at ¶ ¶ 9-12.)

Plaintiff and Minimatic's relationship was based on an agreement dated March 14, 1991.  The agreement provides that Plaintiff would be a consultant and collaborator with Minimatic. (March 1991 Agreement, Ex. C, DE 125; Pl. Dep. 35-36, 386-87.)  The agreement also stated that the "[d]rawings and 510(k)s are the property of Minimatic and its stockholders." (March 1991 Agreement ¶ 2.K.)  On June 19, 1992, Plaintiff filed a patent application which subsequently issued as U.S. Patent No. 5,316,476 ("the '476 Patent") on May 31, 1994. ('476 Patent, Ex. G, DE 125.)  That patent expired on May 31, 1998 for failure to pay maintenance fees. (U.S. PTO Bibliographic Data, Ex. U, DE 125.)

In 1993 and 1994, Plaintiff filed several lawsuits against Minimatic, American BioDental Corp., and Leon Shaw, the president and chief executive officer of Minimatic.  The lawsuits

asserted ownership of the dental implant system and infringement of the '476 patent. (Krauser v. Shaw, No. CL-93-5862-AJ (15th Jud. Cir. Palm Beach Cty, June 28, 1994), Ex. H, DE 125; Krauser v. Minimatic Implant Tech., Inc., No. CL-94-8521 (S.D. Fla. Dec. 7, 1994), Ex. I, DE 125; Krauser Dep. 47-48.) Minimatic filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 10, 1996. (Final Decree In re Minimatic Implant Tech. Inc., No. 96-30109 (Bankr. S.D. Fla. Jan. 23, 1998), Ex V, DE 125). American BioDental Corp. filed a petition for relief pursuant to Chapter 11 of the Bankruptcy Code on April 2, 1996. (Final Decree In re American Bio-Dental Corp., No. 96-31318 (Bankr. S.D. Fla. Jan. 23, 1998), Ex. V, DE 125.)

Plaintiff, Minimatic and American BioDental Corp. (both companies now known as BioLok) executed a settlement agreement dated May 28, 1996 ("the May Settlement Agreement") which sought to settle the 1993 and 1994 lawsuits. (May Settlement Agreement, Ex. M, DE 125; Pl. Dep. 53; Boggan Decl. ¶¶ 3, 12.) The May Settlement Agreement was submitted to the bankruptcy court for approval. (Pl. Dep. 53.) However, the debtors Minmatic and BioLok subsequently moved to withdraw their motion to approve the settlement agreement. The bankruptcy court then vacated the settlement agreement and it was never approved. (September 12, 1996 Order Granting Motion to Withdraw Debtors' Motion to Approve Settlement Agreement with Krauser et al. and Request to Vacate Settlement Agreement, Ex. R, DE 125.) Among other provisions,[1] the May Settlement Agreement stated that if the bankruptcy

---

[1] Paragraph 18 of the May Settlement Agreement states:

The board of directors of Minimatic/ABC does hereby recognize Krauser's significant individual contribution to the invention and creation of what is today known as the "Minimatic Implant System" in concept, design, design application, ease of installation and

court did not approve the agreement, the parties could not enforce it, other than the specific representations they expressly agreed would survive in the event the court did not approve it. (May Settlement Agreement ¶ 30.[2])

Plaintiff, Minimatic and American BioDental Corp. executed a new settlement agreement dated October 16, 1996. (October 1996 Settlement Agreement, Ex. N, DE 125; Pl. Dep. 71-72; Boggan Decl. ¶¶ 3, 12.)  The October Settlement Agreement was approved by the bankruptcy court on November 26, 1996. (Order Granting Debtors' Motion to Approve, In re Minimatic Implant Tech., Inc., No. 96-30109 (Bankr. S.D. Fla. Nov. 26, 1996), Ex. W, DE 125.)  On February 12, 1997, the bankruptcy court entered an order confirming the debtors' joint plan of reorganization and incorporated the October Settlement Agreement. (Order Confirming Joint Second Amended Plan of Reorganization, In re Minimatic Implant Tech., Inc., No. 96-30109, at 5 (Bankr. S.D. Fla. Feb. 12, 1997), Ex. X, DE 125.)  The October 1996 Settlement Agreement settled Plaintiff's 1993 and 1994 lawsuits.  (October Settlement Agreement, Ex. N, DE 125.)

Paragraph two states in part:

---

> overall system requirements. The board of directors of Minimatic/ABC also hereby recognize that without Krauser's contribution, it is unlikely that the current product line would have ever been developed or would have ever reached the market place.

(May Settlement Agreement ¶ 18.)

[2] Paragraph 30 of the May Settlement Agreement states:

Minimatic/ABC specifically acknowledge and agree that in the event the court denies the approval of this Settlement Agreement for any reason whatsoever, that each of the representations made by each of the parties in… ¶ 18 (in its entirety)… of this Settlement Agreement may be used in any proceeding between these parties.

(May Settlement Agreement ¶ 30.)

> As consideration for their performance under this Settlement Agreement, Krauser will conditionally grant to the Debtors an exclusive license by separate document, a copy of which is attached hereto as "Exhibit A," any and all rights he may have in the Patent and the dental implant system currently being manufactured by the Debtors. . . .

(October Settlement Agreement ¶ 2.)

> Paragraph three states in part:

> As payment to Krauser for the Debtors' continued sale of the dental implant products that comprise their dental implant system, which Krauser maintains he has rights in and to but which Krauser is willing to forego for so long as said payments are fully and timely made, the Debtors will pay to Krauser the following sums in the following manner:

> . . .

> (i) 0% of the total net sales of Debtors . . . between zero and $1,750,000.00 of all dental implant products set forth and described in the Debtors' current product catalog, a copy of which is attached hereto as Exhibit "B," as well as any other dental implant products of any kind or nature whatsoever which are designed and/or used for dental implantalogy which are sold by the Debtors . . . now or in the future. . .

(October Settlement Agreement ¶ 3.)

> Paragraph seven states:

> "Events of default" as referenced herein shall include, but shall not be limited to, the following: (1) The failure of Minimatic or ABC to pay to Krauser, at the time said payments are due, or in the amount called for herein, any of the sums required by this Settlement Agreement to be paid to him, however, Minimatic/ABC shall be entitled to five (5) business days' written notice thereof by telecopier at (954) 698-9925 and/or regular mail to Minimatic/ABC 's business premises to cure any such default; (2) The failure of Minimatic or ABC to comply with any of the provisions of this Settlement Agreement or the terms of the Debtors' Amended Plan as it pertains to Krauser, and in the case of their failure to comply with a non-monetary provision of this Settlement Agreement, their failure to cure such non-compliance following ten (10) business days after their receipt of written notification by telecopier at (954) 698-9925 and or regular mail to Minimatic/ABC's business premises from Krauser specifying the non-compliance; (3) The conversion to, or a voluntary filing of, a Chapter 7 or Chapter 11 proceeding in bankruptcy by either Minimatic or ABC, or any parent corporation thereof, or successor to either of them by merger or acquisition, at any time while any monies are then owed or will be owed in the future to Krauser; or (4) A judicial or other dissolution of either Minimatie or ABC-other than the merger and/or consolidation of one of them into the other.

(October Settlement Agreement ¶ 7.)

Paragraph eight of the October Settlement Agreement states as follows:

> In the event of a default (as defined above) by either or both of the Debtors, Krauser's conditional license of his Patent shall terminate.  In addition, Krauser shall have the option, but not the obligation, to institute suit against Debtors for money damages and/or declaration of his rights in and to the dental implant system currently being manufactured by the Debtors, as well as any and all 510(k) filings, related documents and drawings of the Debtors.

(October Settlement Agreement ¶ 8.)

Paragraph twelve of the October Settlement Agreement states as follows:

> Upon this Settlement Agreement being approved, the parties to this Settlement Agreement will exchange releases as to any and all claims or causes of action between them, subject only to the terms, obligations and reservations of rights imposed under this Settlement Agreement, in the forms attached as Exhibits "D," "E," "F," and "G" respectively.  These releases will become effective immediately upon the Debtors' Amended Plan being confirmed.

(October Settlement Agreement ¶ 12.)

In conjunction with the October Settlement Agreement, the parties also entered into a limited release which stated, in pertinent part, as follows:

> This Limited Release is specifically not intended to release, and therefore specifically excludes, a release by [Plaintiff] of any representations, obligations, undertakings, responsibilities or other liabilities of [Minimatic and American BioDental Corp.] in (1) that certain Settlement Agreement entitled "Settlement Agreement with Krauser . . .; or (2) that certain License Agreement . . . executed in connection with the referenced Settlement Agreement.

(Limited Release, Ex. N, DE 125.)

Plaintiff has never identified how much money he has received from Defendants, or how much money he was owed by BioLock or any other Defendant. (Pl. Dep. 282-283.) Plaintiff states that this is a result of Defendants' failure to permit an audit of their records and books of account.

6

(Pl. Aff. ¶ 50.)

Plaintiff did not provide Defendants with a "formal written notice of default" prior to October 2009. (Krauser Dep. 81-82, 105-07, 267; Pl Resp. to Def. Request for Admissions Nos. 12-23, Ex. Y, DE 125.) Plaintiff did, however, fax Defendants a request for an audit in late 2006 and made "many additional requests by telephone, fax and email, to both pre-acquisition and post-acquisition offices to inspect the Defendant's records." This continued in 2007 and 2009. (Pl. Aff. ¶¶ 51-52.) Throughout the time period of 2006 through 2009, Plaintiff states that Defendants acknowledged they owed him money under the Agreement, but could not pinpoint a figure. (Id. at ¶ 53.) Plaintiff continued to be in contact with Defendants about the money he believed was owed to him, both before and after October 2009. (Id. at ¶¶ 53, 56.) In October 2009, Plaintiff filed suit against Defendants in a case styled Jack Krauser, D.M.D. v. Minimatic Implant Technologies, Inc., etc., Case No. 2009 CA 033368 XXXX MB A. (Id. at 56.) On October 15, 2009, Plaintiff personally served Defendants with two notices of default as well as filed those notices with the court. (Id. at 57; October 15, 2009 Notices, Ex. K, DE 125.) Next, on or about December 14, 2009, Plaintiff filed a Notice of Voluntary Dismissal without Prejudice of the 2009 action and served Defendants with additional notices of default. (Pl Aff. ¶ 58; December 14, 2009 Notice, Ex. L, DE 125.) This was followed by an additional notice demanding Defendants cure their defaults under the October Settlement Agreement. (Pl. Aff. ¶ 59; December 29, 2009 Notice, Ex. N, DE 125.) The instant lawsuit was filed in state court and the action was subsequently removed to this Court on April 1, 2010. (Notice of Removal, DE 1.)

The dental implants marketed by Minimatic, BioLok, and BioHorizons are or were manufactured and sold pursuant to FDA regulatory clearances called a 510(k). FDA records identify

7

"Minimatic, Inc." or "Minimatic Implant Technology" as the applicant for each of the Minimatic 510(k)s. (Heather S. Rosecrans Decl. ¶¶ 33-135, DE 126.) The FDA understands the ownership of 510(k) clearances resides with Minimatic, Inc. or Minimatic Implant Technology. (Id. at ¶¶ 2, 33-135.) Ownership of a 510(k) is determined by the identification in the cover letter of the 510(k) who is submitting the 510(k); however, the person who submits the 510(k) might not be the owner, if that person is submitting it on behalf of a company. (Rosecrans Dep. 238, Ex. V, DE 155.) The FDA does not make a legal determination regarding ownership. Instead, the FDA states that they "understand" that the applicant is the owner. (Id. at 240.)

Because FDA records identify "Bio-Lok Intl., Inc." as the applicant for each of the BioLok 510(k)s at issue, the ownership of 510(k) clearances resides with Bio-Lok. (Rosecrans Decl. ¶¶ 201, 203, 205.) Likewise, because FDA records identify "BioHorizons Implant Systems, Inc." as the applicant of each of the BioHorizons 510(k)s at issue, the ownership of 510(k) clearances reside with BioHorizons Implant Systems, Inc. (Id. at ¶¶ 136-37, 139, 143-200.) None of the 510(k)s indicate Plaintiff either as applicant at time of submission or owner at time of clearance.[3] (Id. at ¶ 34-135, 139, 141.)

Plaintiff is not listed as an inventor on the face of any patents owned by Defendants or listed on any patent other than patent '476.[4]

---

[3] Plaintiff disputes that Defendants own any of the subject 501(k)s or that Plaintiff has not been the owner of the subject matter set forth in the subject 510(k) clearances. (Pl. Statement of Fact ¶ 29.) However, Plaintiff's citation to the record is "Brunski Aff. generally; Krauser Aff., generally." Parties are required to support their statement of facts with "*specific* references to. . .affidavits on file." S.D. Fla. L.R. 56.1(a)(2) (emphasis added).

[4] In both Defendants' statement of facts and Plaintiff's response to the statement of facts, the parties address whether Biohorizon's tapered internal implants are the same the dental implants as the 1996 system. The Court notes, however, that several facts set forth by

8

Plaintiff's second amended complaint seeks declaratory relief. Specifically, Plaintiff asks the Court to: (1) construe the terms of the October 1996 Settlement Agreement; (2) find that Defendants defaulted under the terms of the October 1996 Settlement Agreement by failing to pay timely all amounts they owe him thereunder, by failing to provide timely the sales reports required thereunder, or by failing to allow him and his accountants to inspect and conduct an audit of their books and records; (3) find that Defendants failed to cure their monetary and non-monetary defaults within the applicable time periods after Plaintiff provided them with written notice of their defaults; (5) find that the conditional license Plaintiff granted Defendants under the October 1996 Settlement Agreement to manufacture, use and sell his dental implant system has terminated; (6) find that Plaintiff is the owner of the subject matter set forth in all of Defendants' patents based on Plaintiff's '476 patent; (7) find Plaintiff is the owner of the subject matter set forth in all of Defendants' 510(k) registrations; (8) find Plaintiff is the owner of the dental implant system, now commercially known as the BioHorizons Tapered Implant System, including, without limitation, the tapered Laser-Lok and the mountless TLX series, as well as any related 510(k) filings, documents and drawing and (9) award him attorney's fees and costs. (Second Am. Compl., DE 31.)

Defendants make the following arguments in support of their motion for summary judgment: (1) Plaintiff's action is one for specific performance and therefore is untimely under the one-year statute of limitations; (2) Plaintiff's written notice of default is untimely, as it was served two and

---

Defendants are not addressed by Plaintiff consistent with Local Rule 56.1(a)(2) of the Southern District of Florida which requires that parties support their statement of facts with "*specific* references to. . .affidavits on file.") (emphasis added). See S.D. Fla. L.R. 56.1(a)(2). In particular, the Court notes that paragraphs 22 and 23 of Plaintiff's response to the statement of facts do not provide adequate specificity and paragraph 25 cites to a diagram which the Court is unable to decipher. These paragraphs therefore cannot serve to raise a factual question.

one-half years after the expiration of the October settlement agreement; (3) Plaintiff's claims are barred by the 1996 October settlement release; (4) the term "currently being manufactured" in paragraph eight of the October settlement agreement only applies to dental implants that were being manufactured in October 1996 and the implants at issue are not the same implants manufactured in 1996 and (5) Plaintiff has no ownership rights in Defendants' implant systems.

Plaintiff responds that he is not seeking specific performance of any kind. Instead, he seeks declaratory relief, which is therefore timely under the applicable five-year statute of limitations. As such, his notices of default are timely as well. Next, Plaintiff claims the limited release did not release his claim for a declaration relative to the October 1996 settlement agreement. With respect to the meaning of "currently manufactured," Plaintiff contends that he is entitled to a declaration that the term is not limited to the type of implants manufactured in 1996 BioLok, but rather encompasses implants manufactured when the declaration is sought[5]

II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

---

[5] Plaintiff belatedly moves for summary judgment in his response memorandum. Because Plaintiff did not seek leave from the Court to file this motion after the dispositive motion deadline, the motion is denied.

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

III.  Discussion

A. Statute of limitations

In moving for summary judgment, Defendant posits that the relief sought by Plaintiff is not declaratory relief, but specific performance.  According to Defendant, a declaration of ownership of the dental implants "with the ultimate end of compelling Defendants to transfer property allegedly in conformance with the requirements of the October Settlement Agreement" constitutes specific performance and therefore is subject to a one-year statute of limitations.  (Mot. at 12.)  Plaintiff concedes the one-year statute of limitations would apply if he was pursuing a specific performance claim. Rather, Plaintiff asserts he is seeking declaratory relief relative to his rights and Defendant's obligations under the contract.  (Resp. at 15.)

The Declaratory Judgment Act, 28 U.S.C. § 2201(a) provides in relevant part:

> In a case of actual controversy within its jurisdiction .. . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).[6]  Simply put, a declaratory judgment serves to clarify legal relations.  Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC, 650 F. Supp. 2d 1213, 1231 (S.D. Fla. 2009); Eisenberg v. Standard Ins. Co., No. 09–80199, 2009 WL 1809994, at *3 (S.D. Fla. June 25, 2009).

After careful review of the Second Amended Complaint, the Court finds that this action is

---

[6] When a declaratory judgment action has been removed to federal court, it is treated as though it had been filed under the federal declaratory judgment act. See Jones v. Sears Roebuck and Co., 301 Fed. Appx. 276, 281 n.12 (4th Cir.2008); Chapman v. Clarendon National Ins. Co., 299 F. Supp. 2d 559, 563 (E.D. Va. 2004). Declaratory judgment acts are procedural in nature and, thus under the Erie doctrine, this Court must apply federal procedural law. See Haagen–Dazs Shoppe Co., Inc. v. Born, 897 F. Supp. 122, 126 n. 2 (S.D.N.Y.1995) (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950).

indeed a declaratory judgment action and the relief sought by Plaintiff seeks nothing more than to clarify the legal relations between the parties. Indeed, should Plaintiff prevail, he would obtain a ruling that Defendants defaulted under the October settlement agreement, that he is the owner of various intellectual property, and the license Plaintiff granted to Defendants under October settlement agreement has terminated. Despite Defendants' protestations to the contrary, Plaintiff would not receive a transfer of property. To the extent that Defendants are concerned about Plaintiff's ability to obtain that remedy in a future lawsuit, Defendants are free to raise their argument regarding specific performance at that time. Lastly, the Court notes that the clear language of the 1996 settlement agreement permits Plaintiff to seek either money damages or a declaration of his rights. That is precisely what Plaintiff has done. The Court rejects Defendants' argument to the contrary. As such, the Court rejects, as a matter of law, Defendants' reliance on a one-year statute of limitations.

Because the Court has rejected Defendants' reliance on the one-year statute of limitation, the Court also rejects, as a matter of law, Defendants' argument that Plaintiff's notices of default were untimely based upon that one-year statute of limitations. (Mot. at 16; Reply at 8.) With respect to Defendants' argument that Plaintiff's notices of default were defective because the notices do not provide an adequate description of the alleged breach, such as the amount of claimed underpayment, the Court concludes that Plaintiff has raised a question of fact on this point. Plaintiff points to record evidence that he attempted to obtain access to Defendants' records and request an audit. (Pl. Aff. ¶¶ 51-53, 56.) Hence, a fact finder could find that Plaintiff was unable to state definitely the amount he claimed to have been underpaid without the ability to conduct the necessary audit. For this reason, the Court denies summary judgment on this basis.

13

B.  The October Settlement Agreement

Defendants move for summary judgment, claiming that the term "currently being manufactured" in paragraph eight of the October Settlement Agreement only applies to dental implants that were being manufactured in October 1996.  In contrast, Plaintiff insists that "currently being manufactured" pertains to the dental implant system being manufactured at the time litigation relating to the 1996 agreement is brought.

Settlement agreements are governed by the rules for interpretation of contracts.  In re Chira, 567 F.3d 1307, 1312 (11th Cir. 2009);  Resnick v. Uccello Immobilien GMBH, Inc., 227 F.3d 1347, 1350 (11th Cir. 2000); Robbie v. City of Miami, 469 So. 2d 1384, 1385 (Fla. 1985); Hanson v. Maxfield, 23 So. 3d 736 (Fla. Dist. Ct. App. 2009); Cheverie v. Geisser, 783 So. 2d 1115, 1118 (Fla. Dist. Ct. App. 2001).  "Where the contractual language is clear, courts may not indulge in construction or modification and the express terms of the settlement agreement control." Security Ins. Co. of Hartford v. Puig, 728 So. 2d 292, 294 (Fla. Dist. Ct. App. 1999); see O'Neill v. Scher, 997 So. 2d 1205, 1207 (Fla. Dist. Ct. App. 2008) (same); Commercial Capital Resources, LLC v. Giovannetti, 955 So. 2d 1151, 1153 (Fla. Dist. Ct. App. 2007) (same).

After careful consideration, the Court finds, as a matter of law, that the term "currently being manufactured" applies only to dental implants that were being manufactured in October 1996. In other words, the Court concludes, as a matter of law, that the term "currently" referred to the time the contract was executed.  It did not refer to the time litigation was brought or tried.  Significantly, the Minimatic 1996 Product Catalog was attached to the October Settlement Agreement, thereby referencing the items then currently being manufactured by Defendants on that date.  Furthermore,

a comparison of the language of paragraph eight to the broader language of paragraph three supports the Court's finding. Paragraph three covers "all dental implant products of any kind or nature whatsoever which are designed and/or used for dental implantology which are sold by Debtors, any subsidiaries thereof or any successor owner of the Debtors by merger or acquisition, now or in the future." This language encompasses implants manufactured at a future time, not just at the time the contract was executed. Thus, had the parties intended to include implants other than these being manufactured in October 1996, they knew how to include language to accomplish that result. Hence, the parties intended the term "currently manufactured" to be limited to a narrower category of dental implants that existed at the time the agreement was entered into, and not those created in the future.[7] See Kel Homes, LLC v. Burris, 933 So. 2d 699, 703 (Fla. Dist. Ct. App. 2006) (the use of different language in different contractual provisions strongly implies that a different meaning was intended).

Based on this finding, the Court finds, as a matter of law, that, assuming Plaintiff can show a default, Plaintiff would only be entitled to a declaration of his rights in the dental implant system manufactured in 1996.

C. Ownership Rights

Defendants move for summary judgment on the basis that Plaintiff has no ownership rights

---

[7] Plaintiff points to language in paragraph three that states "all dental implant products described in the Debtors' current product catalog, a copy of which is attached hereto as Exhibit B," as support for its claim that "products" was a "moving target" of an "ever expanding and evolving line of dental implant products." (Resp. at 22.) The Court disagrees. Significantly, paragraph three refers to products attached as Exhibit B to the October Settlement Agreement, whereas paragraph two refers to the "dental implant system currently being manufactured by the Debtors" attached as Exhibit A to the October Settlement Agreement. In other words, these are different product catalogs. Thus, paragraph three refers to entirely different products than those contemplated by the "dental implant system currently being manufactured by the Debtors."

in the subject matter set forth in Defendants' patents, the subject matter set forth in Defendants' 510(k) registrations, or the "BioHorizons Tapered Internal Implant System." In support, Defendants note that Plaintiff withdrew his claim for inventorship earlier in this litigation. Additionally, Defendants contend that initial ownership of a 510(k) is determined by looking to the submitter/holder of the 510(k), and the 510(k)s under which the BioHorizons Tapered Implants are marketed identify BioHorizons as the submitter. Next, Defendant states that neither the October Settlement Agreement nor the May Settlement Agreement transferred any patents or 510(k)s to Plaintiff. Likewise, Defendants assert that Plaintiff's 1991 consulting agreement does not transfer any patents or 510(k)s to him. Lastly, Defendants contend that Plaintiff's ownership claim based on his '476 patent is at odds with patent law.

Plaintiff responds that questions of fact exist as to which particular version of the implant system he owns because the present system manufactured by Defendants is the same system previously manufactured by Defendants in 1996. He also states that the dental implant system "has always incorporated his individual ideas, inventions and other intellectual property." (Resp. at 29.)

With respect to the issue of whether Plaintiff has ownership over the 1996 dental implant system, the Court will first review some basic tenets of inventorship and the ownership of patent rights. There is a distinction between inventorship and the ownership of patent rights. Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 (Fed. Cir. 1993) ("It is elementary that inventorship and ownership are separate issues.") The concept of inventorship addresses who invented the subject matter claimed in the patent whereas the concept of ownership addresses who owns the legal title to the subject matter claimed in a patent. Id. Generally speaking, inventorship is the starting point for determining ownership of patent rights. University Patent Inc. v. Kligman, 762 F. Supp. 1212,

1218-19 (E.D. Pa. 1991); see Access Cardiosystems, Inc. v. Fincke, 340 B.R. 127, 146-147 (Bankr. D. Mass. 2006) ("Under federal law, the named inventor on a patent application is presumed to be the legal owner of the property rights embodied in the patent application and any ensuing patents"). Patents have attributes of personal property and therefore may be assigned and transferred. 35 U.S.C. § 261 ("patents shall have the attributes of personal property . . . [and] applications for patent, patents, or any interest therein, shall be assignable. . . .").

The use of state law to determine "inventorship" is barred under the doctrine of preemption. University of Colorado Foundation, Inc. v. American Cyanamid Co., 196 F.3d 1366, 1372 (Fed. Cir. 1999) ("[t]he federal Patent Act leaves no room for states to supplement the national standard for inventorship"); see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 151–52 (1989) ("[T]he ultimate goal of the patent system is to bring new designs and technologies into the public domain through disclosure. State law protection for techniques and designs whose disclosure has already been induced by market rewards may conflict with the very purpose of the patent laws by decreasing the range of ideas available as the building blocks of further innovation. The offer of federal protection from competitive exploitation of intellectual property would be rendered meaningless in a world where substantially similar state law protections were readily available."); Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1331 (Fed. Cir. 1998), overruled in part on other grounds by, Midwest Industries, Inc. v. Karavan Trailers, Inc., 175 F.3d 1356 (Fed. Cir. 1999)) (state law cause of action that purports to hold a patentee liable on unfair competition claims for publicizing its patent rights without requiring the publication to be in bad faith or for asserting a patent procured with inequitable conduct where the misconduct before the patent and trademark office was not fraud are preempted by federal patent law that requires the higher level of misconduct)

17

In contrast, state law governs contractual obligations and transfers of property rights to patents. Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1571 (Fed. Cir. 1997) ('It may seem strange at first blush that the question of whether a patent is valid and infringed ordinarily is one for federal courts, while the question of who owns the patent rights and on what terms typically is a question exclusively for state courts. Yet that long has been the law.'); see Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1370 (Fed. Cir. 2008) ("Construction of patent assignment agreements is a matter of state contract law."); Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Systems, 583 F.3d 832, 841 (Fed. Cir. 2009) (applying California statute of limitations and discovery rule to patent ownership claims). If determining ownership does not require a determination of inventorship, patent law is not implicated. HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co., Ltd., 600 F.3d 1347, 1356-57 (Fed. Cir. 2010).

The Court begins its analysis by agreeing with Defendants that, to the extent Plaintiff is basing his rights on a claim of inventorship, he is precluded from doing so based on his previous statement withdrawing his claim of inventorship. (DE 22 at 2-3, 5-6; DE 30 at 10.) Furthermore, Plaintiff admits that he is not listed on face of the subject patents which are incorporated in the BioHorizons Tapered Internal Implant System. (Pl. Resp. To Def. Statement of Facts ¶ 30.) Therefore, he cannot base a claim of ownership based on his contributions to the dental implant system or Defendants' use of his ideas. See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 149 (1989) ("Once an inventor has decided to lift the veil of secrecy from his work, he must choose the protection of a federal patent or the dedication of his idea to the public at large."); Waner v. Ford Motor Co., 331 F.3d 851, 856-57 (Fed. Cir. 2003) (finding the plaintiff could not recover under state law for unjust enrichment when he did not obtain a patent for his

invention). If Plaintiff does not have ownership due to inventorship, he must provide a state law basis to assert his property rights, such as contract, assignability, conversion, fraud, etc. Plaintiff only points to contractual rights.

Notably, Plaintiff does not rely on any provision of his 1991 consulting agreement with Minimatic that transferred any patents or 510(k)s to him. In fact, that agreement states that "drawings and 510(k)'s are the property of Mimatic and its stockholders." (March 1991 Agreement ¶ 2.K.) With respect to the May Settlement Agreement, not only did the bankruptcy court not approve the agreement, it expressly vacated the agreement. (September 12, 1996 Order Granting Motion to Withdraw Debtors' Motion to Approve Settlement Agreement with Krauser et al. and Request to Vacate Settlement Agreement.) Nonetheless, Plaintiff relies on paragraphs 18 and 30 of the May Settlement Agreement to demonstrate his ownership. Plaintiff cannot, however, rely on an unapproved, vacated settlement agreement, especially when he never challenged the bankruptcy court's order when entered.[8] See American Prairie Constr. Co. v. Hoich, 594 F.3d 1015, 1024-25 (8th Cir. 2010). Even assuming Plaintiff could rely on the vacated May Settlement Agreement, there is no language in that agreement that states Plaintiff is the owner of the dental implant system. It merely acknowledges that Plaintiff contributed to the creation of the system.

Finally, the Court rejects Plaintiff's argument that there is a question of fact regarding ownership of the 510(k)s because it is possible to transfer 510(k)s without anyone notifying the

---

[8] While Plaintiff does argue that the October Settlement Agreement authorizes him to file suit for a declaratory judgment regarding his rights in and to the dental implant system currently being manufactured by Defendants, he does not argue that this settlement agreement transfers ownership rights to him. (Resp. at 16.)

FDA. (Resp. at 28.) Plaintiff, however, has failed to point to any record evidence that the 510(k)s were transferred to him. Even assuming that Defendants no longer possessed ownership over the 510(k)s, that would not mean that ownership has been transferred to Plaintiff.

In sum, it is not enough for Plaintiff to claim ownership of the at-issue intellectual property by stating that the dental implant system incorporates certain features that reflect his ideas. The Court therefore finds, as a matter of law, that Plaintiff has no ownership rights to the aforementioned intellectual property. As such, the Court need not determine whether the dental implant system currently being manufactured by Defendants is the same system as the 1996 dental implant system.

### IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Corrected Motion for Summary Judgment (DE 140) is **GRANTED IN PART AND DENIED IN PART**. The Court will separately issue judgment for Defendant.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 1st day of October, 2012.

_____
KENNETH A. MARRA
United States District Judge